IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br>v.<br><br>TIMOTHY JAY VAFEADES,<br><br>                Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS**<br><br>Case No. 2:14-cr-153-DN<br><br>District Judge David Nuffer |

Defendant Timothy Jay Vafeades moves to suppress evidence[1] discovered as a result of Minnesota State Patrol Inspectors and Troopers stopping, detaining and arresting him at the Red River Weigh Station in Moorehead, Minnesota on November 26, 2013. Vafeades argues that the stop and detention were unlawful and that officers lacked probable cause to arrest him. On December 17, 2014 the court held an evidentiary hearing on the motion.[2] As directed, the parties submitted their positions in the form of draft orders.[3] Argument was heard on February 23, 2015.[4] After a thorough review and consideration of the evidence,[5] arguments, and draft orders submitted by the parties, the motion to suppress is denied.

---

[1] Motion to Suppress, docket no. 41, filed Nov. 3, 2014.

[2] Minute Entry, docket no. 50, filed Dec. 17, 2014.

[3] Defendant's Proposed Memorandum Decision and Order, docket no. 57, filed Feb. 20, 2015; [United States' Proposed] Memorandum Decision and Order, docket no. 59, filed Feb. 23, 2015.

[4] Minute Entry, docket no. 58, filed Feb. 23, 2015.

[5] With consent of defense counsel, the United States submitted a two hour, time stamped video recording without audio of the entire stop at the weigh station. The court watched the entire video prior to the Dec. 17, 2014 evidentiary hearing. *See* Minute Entry, docket no. 48, filed Dec. 3, 2014 ("The government has a video that is 2 hours long and will need to refer to it during the evidentiary hearing and briefing, but asked to submit the video time stamped for referencing purposes. Court instructed counsel to submit prior to the hearing and will have the witness authenticate during the hearing. Government will not need to play the video during the hearing. Defense agreed.").

FINDINGS OF FACT................................................................................................................. 2
    The Inspection................................................................................................................. 2
    The Stop.......................................................................................................................... 5
    Detention........................................................................................................................ 9
    Arrest............................................................................................................................ 11
DISCUSSION ....................................................................................................................... 12
    1. The Stop................................................................................................................... 12
        A. Federal, not state law, determines the constitutionality of the vehicle stop .... 13
        B. The stop was supported by reasonable suspicion............................................. 15
        C. The CJIS warning does not vitiate reasonable suspicion ................................ 19
    II. Detention ................................................................................................................. 20
        A. The stop was lawfully extended until State Troopers arrived to investigate ... 20
        B. The Troopers had reasonable suspicion to detain to further investigate .......... 22
    III. The arrest was supported by probable cause............................................................ 24
ORDER ................................................................................................................................. 26

## FINDINGS OF FACT

### The Inspection

On November 26, 2013 at approximately 5:33 p.m., Defendant Timothy Vafeades pulled his commercial truck into the Red River Weigh Station in Moorehead, Minnesota.[6] According to Chad Olschlager, a Commercial Vehicle Inspector (CVI) with the Minnesota State Patrol who was on duty that night, a lighted board along the highway directs some trucks entering the weigh station to stop for an inspection.[7] That evening, CVI Olschlager directed Vafeades's truck to stop at the weigh station so CVI Olschlager could conduct a level three stop.[8] CVI Olschlager explained that during a level three stop he checks vehicle registrations and drivers' licenses, as well as drivers' log books to ensure they are accurate and up to date.[9] CVI Olschlager also

---

[6]Tr. 20:10-16 Dec. 17, 2014, docket no. 53, filed Jan. 9, 2015; Govt. Ex. 9.

[7] Tr. 12:15-14:14.

[8] Tr. 17:6-10.

[9] Tr. 17:11-16.

explained that as a CVI, he is authorized to conduct inspections on trucks and related paperwork, but he does not have the authority to arrest or detain people.[10]

After the truck pulled in and parked, Vafeades and his passenger, Victim A, entered the weigh station office.[11] The area where truck drivers stand while their paperwork is examined is "not a real big room, somewhere in that six to eight feet range."[12] When Vafeades and Victim A entered the weigh station office, CVI Olschlager asked for, among other things, Vafeades's credentials, including his driver's license, and paperwork for the truck and trailer.[13] CVI Olschlager asked for Vafeades's driver's license, which is standard procedure, to confirm that it was valid and to determine whether Vafeades had any warrants.[14]

CVI Olschlager ran the driver's license through the Criminal Justice Information System (CJIS) and initially noted that Vafeades's driver's license was valid and that there was a limited extradition warrant for Vafeades out of Florida.[15] As CVI Olschlager read further down the CJIS Response on his computer screen, he also saw that there was a protection order out of Florida.[16] CVI Olschlager called Minnesota State Patrol dispatch and learned the warrant was valid but Florida would not extradite. He did not immediately look into the protection order.[17] In fact, CVI Olschlager put the protective order "on the back burner."[18]

---

[10] Tr. 36:18-24.

[11] Tr. 20:17-25; Govt. Ex. 10.

[12] Tr. 125:23-24.

[13] Tr. 21:5-9; Govt. Ex. 10.

[14] Tr. 21:10-22.

[15] Tr. 21:23-25.

[16] Tr. 22:1-2; Govt. Ex. 11.

[17] Tr. 22:22-23; 23:8-12.

[18] Tr. 23: 8-10.

During the next hour or so that Vafeades and Victim A were at the weigh station, CVI Olschlager interacted with them while reviewing Vafeades's paperwork for his truck, his trailer, and his log book.[19] But CVI Olschlager was not at the counter the whole time.[20] He went back and forth between the computer and the counter while reviewing the paperwork.[21]

During this time, CVI Olschlager noticed that Victim A "never really" looked at him, hiding her face or looking away, or she sat in a darker area of the office weigh station.[22] However, as a passenger, Victim A had no reason to interact with CVI Olschlager.[23] CVI Olschlager could not remember whether Victim A was on a cell phone while she was standing at the counter with Vafeades.[24] He also noticed her wandering around the office at one point, and said it was possible that she was fiddling with her hands while sitting down.[25] CVI Olschlager also noticed that Vafeades generally talked a lot and was "kind of demanding" when he talked to Victim A.[26]

` CVI Cynthia Harms, who was also working that night, was in the weigh station office for part of the time CVI Olschlager worked on Vafeades's inspection.[27] Except to assist with the warrant check, CVI Harms dealt with other trucks coming through the weigh station and did not participate in Vafeades's inspection.[28] Instead, CVI Harms sat at the scale controls directing

---

[19] Tr. 23:13-18; 35:7-11.

[20] Tr. 34:25-35:2, 7-11.

[21] Tr. 21:7-9; 23:13-18; 35:3-11.

[22] Tr. 24:20-25:2.

[23] Tr. 49:15-18.

[24] Tr. 35:12-36:6; Def. Ex. C.

[25] Tr. 38:11-21; Def. Exs E and F.

[26] Tr. 25:5-9.

[27] Tr. 52:12-19.

[28] Tr. 52:17-53:4; 70: 9-23.

weigh station traffic, and was not directly facing the counter.[29] She also went in and out of the building several times to conduct inspections.[30] While CVI Harms was in the office, she noticed that Vafeades talked a lot, which in her experience is used as a way to distract the inspectors.[31] CVI Harms also noticed that that Vafeades would not allow Victim A to speak, and Victim A always had her head down and would not make eye contact with anyone.[32] CVI Harms also noticed Victim A walking around the room, sitting on a bench, and playing with her hands.[33] CVI Harms acknowledged that only one or two questions in the regulatory stop might give Victim A cause to be involved in the discussion.[34] Because CVI Harms felt that something was not right with Victim A, CVI Harms tried to engage with Victim A by greeting Victim A when CVI Harms went in and out of the weigh station office.[35] CVI Harms said hello to Victim A on three occasions, but Victim A would not make eye contact, her head was down, or she appeared to be fidgeting with her hands. Victim A only responded to CVI Harms once by saying "Hi."[36] CVI Harms also acknowledged that she never asked Victim A a single question.[37]

**The Stop**

CVI Olschlager finished the administrative stop and inspection around 6:30 p.m., but before Vafeades and Victim A left the building, CVI Olschlager explained his inspection report

---

[29] Tr. 68:8-13.

[30] Tr. 53:14-24.

[31] Tr. 54:4-8.

[32] Tr. 54:14-18; 55:4-6, 24-25.

[33] Tr. 76:6-11, 16-20.

[34] Tr. 75:4-10.

[35] Tr. 55:9-14, 22-25.

[36] Tr. 55:10-21; 56:1-5; 72:3-24; 73:19-20.

[37] Tr. 83:2-3.

to Vafeades.[38] After Vafeades and Victim A left the office, CVI Olschlager and CVI Harms

looked at each other and said something was not right.[39] CVI Harms asked CVI Olschlager

whether there was something else besides a warrant, which prompted him to scroll back through

the CJIS Response screen.[40] The report states:

```
*****WARNING - THE FOLLOWING IS AN NCIC PROTECTION ORDER RECORD.  DO NOT
SEARCH, DETAIN, OR ARREST BASED SOLELY ON THIS RECORD.  CONTACT ENTERING
AGENCY TO CONFIRM STATUS AND TERMS OF PROTECTION ORDER*****
MKE/PROTECTION ORDER
ORI/FL0580000 NAM/VAFEADES,TIMOTHY JAY SEX/M RAC/W
DOB/1960▊▊▊▊ HGT/509 WGT/163 EYE/BRO HAI/BRO
SMT/TAT UL ARM
SOC/▊▊▊▊▊▊▊▊
ISD/19991101 EXP/NONEXP
PPN/PADGETT,TRACY PSX/F PPR/W PPB/1969▊▊▊▊▊
PCO/04 - THE SUBJECT IS REQUIRED TO STAY AWAY FROM THE RESIDENCE, PROPERTY,
PCO/SCHOOL, OR PLACE OF EMPLOYMENT OF THE PROTECTED PERSON OR OTHER FAMILY OR
PCO/HOUSEHOLD MEMBER.
OCA/199817862JPB21
VLD/20130102
MIS/FINAL ORDER SERVED, PETITIONER AND OBO MINOR CHILDREN▊▊▊▊▊▊▊AND▊▊▊▊▊▊▊
MIS/ VAFEADES
ORI IS SARASOTA CO SO SARASOTA 941 861-5440
PCO/05 - THE SUBJECT IS RESTRAINED FROM MAKING ANY COMMUNICATION WITH THE
PCO/PROTECTED PERSON INCLUDING BUT NOT LIMITED TO, PERSONAL, WRITTEN, OR
PCO/TELEPHONE CONTACT, OR THEIR EMPLOYERS, EMPLOYEES OR FELLOW WORKERS, OR
PCO/OTHERS WITH WHOM THE COMMUNICATION WOULD BE LIKELY TO CAUSE ANNOYANCE OR
PCO/ALARM THE VICTIM.
NIC/H231000759 DTE/20001114 1146 EST DLU/20130102 1240 EST
```

As CVI Olschlager went back through the CJIS Response screen, he saw Victim A's name on

the protection order and remembered that Vafeades had said Victim A's first name.[41] CVI

Olschlager noticed that the protection order referred to a minor child, but at that time he did not

know whether Victim A was a minor.[42] He also read that the protection order said "Do not

---

[38] Tr. 26:8-13.

[39] Tr. 26:14 – 27:1; 56:23-25; 57:8-12.

[40] Tr. 27:2-7; Tr. 57:6-7.

[41] Tr. 27:6-25; Govt. Ex. 11.

[42] Tr. 28:1-4.

search, detain, or arrest based solely on this record."[43] In Minnesota, CVI Olschlager said such orders "need to be looked at right away."[44]

CVI Olschlager alerted CVI Harms to the protection order and they conferred about what to do next.[45] CVI Harms then sent Lt. Charles Backes of the Minnesota State Patrol a message using the computer assisted dispatch system asking him to call her as soon as possible.[46] CVI Harms also sent a message to Trooper David Keenan asking him to "head to the scale ASAP."[47] CVI Harms explained that she called Lt. Backes and Trooper Keenan because the protection order did not allow Victim A to be with Vafeades and because the inspectors could not transport anyone.[48] When Lt. Backes called her back, she told him that they had a protection order that needed to be verified and also needed assistance at the scale.[49] CVI Harms told Trooper Keenan the same information when he called back.[50]

While CVI Harms tried to contact state troopers, CVI Olschlager went back outside to flag down Vafeades.[51] CVI Olschlager had finished his regulatory inspection at 18:31,[52] Vafeades's truck began to leave the weigh station at 18:35,[53] and then CVI Olschlager ran into the road to stop Vafeades from leaving at 18:36.[54] CVI Olschlager does not remember what he or

---

[43] Tr. 40:21-41:6.

[44] Tr. 28:4-5.

[45] Tr. 28:7; 57:13-16.

[46] Tr. 57:16-25; 119:16-17; 122:19-123:4.

[47] Tr. 58:15-20.

[48] Tr. 59:2-6.

[49] Tr. 59:22-24

[50] Tr. 60:5-7.

[51] Tr. 28:6-10; 29:20-25; 42:20-22; 60:5-10.

[52] Tr. 39:13.

[53] Tr. 41:25-42:3.

[54] Tr. 42:5-11.

Vafeades said when he waived the truck down, but the purpose of CVI Olschlager stopping the truck and talking to Vafeades was to get him to come back into the weigh station office.[55] Vafeades complied with CVI Olschlager's directive, returning the truck to the parking lot and Vafeades and Victim A came back into the weigh station office.[56] As a law enforcement officer flagging someone over, CVI Olschlager expected Vafeades to respond.[57] But CVI Olschlager said he was surprised Vafeades returned to the weigh station because Vafeades "could have left at any time."[58] Yet had Vafeades not returned to the weigh station, CVI Olschlager would have called troopers.[59] CVI Harms, in fact, had called the troopers because she was not certain if Vafeades would pull back into the station or if there was going to be a pursuit.[60]

If Vafeades had left the weigh station, Trooper Keenan said he and Lt. Backes would have "pursued the vehicle on the interstate and stopped it again."[61] The troopers might also have radioed ahead to the town just east for assistance from the local police department.[62] Upon stopping the vehicle and having knowledge about the violation of the order of protection, Lt. Backes said the trooper who actually stopped the vehicle "would have grabbed the driver, and the next one on the scene would have grabbed the passenger . . . and everything that was done at the scale that night would have been done at that location on the interstate."[63]

---

[55] Tr. 31:5-15; 43:2-8.

[56] Tr. 31:18-32:3; 43:17-20; Def. Ex. N.

[57] Tr. 49:2-7.

[58] Tr. 32:4-8.

[59] Tr. 32:8-10.

[60] Tr. 58:25-59:1.

[61] Tr. 93:6-8; 106:19-107:12; 108:21-109:17; 124:2-9.

[62] Tr. 124:9-11.

[63] Tr. 124:22-125:4.

**Detention**

When Vafeades and Victim A returned to the weigh station office and approached the counter, CVI Harms asked Victim A for her driver's license to verify Victim A's name.[64] In response, Vafeades took out his wallet and gave CVI Harms Victim A's identification, which was when CVI Harms learned Victim A was 19 years old.[65] CVI Harms said she was surprised to learn Victim A's age because CVI Harms thought Victim A appeared to be about 12 years old.[66]

Trooper Keenan arrived within about seven minutes after CVI Harms's call to respond to the weigh station and Lt. Backes arrived after shortly thereafter.[67] Though Trooper Keenan had not been called to the Red River Weigh Station for a protection order issue before November 26, 2013, he had dealt with them when he was a city officer.[68]

When Trooper Keenan arrived, he took a printout of the CJIS response screen and Victim A's identification to verify the names on the document.[69] Trooper Keenan acknowledged that he saw the warnings on the CJIS report that read "[d]o not search, detain or arrest based solely on this record."[70] Trooper Keenan also acknowledged the CJIS report stated that order of protection pertained to "the minor children[.]"[71]

---

[64] Tr. 61:2-21; Govt. Exs. 17-18.

[65] Tr. 61:22-62:11.

[66] Tr. 62:12-18.

[67] Tr. 93:15-16. CVI Harms testified that Trooper Keenan responded in about 15 to 20 minutes (Tr. 62:19-20), but still photos from the surveillance video show Vafeades and Victim A re-entered the weigh station at 6:39 p.m. and show Trooper Keenan at the weigh station at 6:47 p.m. Govt. Ex. 20; Def. Ex. N.

[68] Tr. 91:23-92:8.

[69] Tr. 96:2-7.

[70] Tr. 111:3-19; Exs. A and 11.

[71] Tr. 112:3-6.

Trooper Keenan called and asked his dispatcher to call Sarasota County, Florida to confirm that the protection order that was issued there was still in effect.[72] Trooper Keenan believes someone returned Victim A's identification; he did not remember whether he also had Vafeades's identification.[73] While Trooper Keenan waited to hear from dispatch, he spoke to Vafeades about the protection order.[74] Vafeades told Trooper Keenan that the protection order was no longer valid because it only applied while Victim A was a minor, and he offered to retrieve documents from his truck to support his assertion.[75] Vafeades also told Trooper Keenan that he was helping Victim A, and began explaining in explicit detail how Victim A had been sexually abused, specifically referring to anal sex and graphically describing other sexual acts.[76] During this interaction, Trooper Keenan noticed Victim A appeared uncomfortable, and that when he tried to ask Victim A questions, Vafeades answered for her.[77]

Eventually Trooper Keenan received a response from the dispatcher confirming that the protection order was still valid.[78] Trooper Keenan was confused by the language of the protection order and the dispatcher's confirmation that the order was still valid, so he called the Clay County Sheriff's office and spoke with Sgt. Bredman who deals with protection orders more frequently.[79] Sgt. Bredman told Trooper Keenan the protection order was "probably good."[80] To further confirm whether the minor child provision in the protection order was still in

---

[72] Tr. 96:17-97:9; Govt. Ex. 19.

[73] Tr. 112:9-24.

[74] Tr. 97:10-15; Govt. Ex. 21.

[75] Tr. 97:16-98:2, 12-15.

[76] Tr. 63:22-64:4; 98:19-99:8; 125:25-126:8.

[77] Tr. 99:2-4, 16-19; 100:5-11; 126:18-23.

[78] Tr. 100:16-22.

[79] Tr. 101:18 – 102:13; 114:19-24; 129:1-8.

[80] Tr. 102: 10-13; 114:19-24; 129:1-8.

effect when the named individual was an adult, Trooper Keenan also spoke with Heidi Davies, an Assistant County Attorney, and read her the language of the protection order.[81] Assistant County Attorney Davies told Trooper Keenan that the language that the protection order was a lifetime order rendered the word "minor" irrelevant and that Trooper Keenan should arrest Vafeades.[82]

While Trooper Keenan was on the phone, Lt. Backes saw Vafeades and Victim A leave the weigh station office.[83] Lt. Backes followed them and stood with them outside of the weigh station office while they smoked.[84] At some point, Vafeades asked why the Minnesota weigh station was handling the protection order differently than other weigh stations that were aware of the protection order.[85] Vafeades also asked what would happen to him, and Lt. Backes told Vafeades that he would likely be arrested for violating the protection order.[86] In response, Vafeades asked if he could retrieve his computer from his truck for his defense.[87] Lt. Backes allowed him to do so and accompanied Vafeades and Victim A to the truck.[88]

### Arrest

After spending approximately twenty minutes verifying the protection order through dispatch and consulting with the sergeant and Assistant County Attorney, Trooper Keenan walked out to Vafeades's truck to tell Lt. Backes the protection order was still valid.[89] At that

---

[81] Tr. 102:14-103:2; 115:5-16; 129:8-10.

[82] Tr. 103:1-9.

[83] Tr. 129:15-17; Govt. Ex. 23.

[84] Tr. 129:15-17, 25-130:1-12; Govt. Ex. 24.

[85] Tr. 127:7-19.

[86] Tr. 130:24-25.

[87] Tr. 131:5-10.

[88] Tr. 131:11-19; Govt. Ex. 25.

[89] Tr. 104:1-105:4; Govt. Ex. 26.

point, either Trooper Keenan or Lt. Backes informed Vafeades that he was under arrest.[90] Once

the group returned to the weigh station office, Trooper Keenan tried to handcuff Vafeades, but

Victim A grabbed Vafeades's arm.[91] Trooper Keenan had to pull her off and get between them.[92]

Trooper Keenan finished handcuffing Vafeades in a nearby hallway, and then transported

Vafeades to the local jail run by the Clay County Sheriff's Department.[93] As Vafeades was being

led away, Lt. Backes restrained Victim A, who was upset and saying, "Don't take my daddy."[94]

After Trooper Keenan led Vafeades away, Victim A fell to the ground.[95]

## DISCUSSION

The arguments presented to the court in this hearing and briefing address only the first

three issues Vafeades raises in his motion to suppress: (1) whether the CVIs lawfully stopped

and detained him; (2) whether the Minnesota State Troopers lawfully detained him; and (3)

whether the troopers had probable cause to arrest him.[96] By agreement, the other issues are

reserved for disposition after this ruling.[97]

## 1. The Stop

Vafeades alleges that stop was unconstitutional because CVI Olschlager exceeded the

scope of his Minnesota state authority and because the stop was not supported by reasonable

suspicion of criminal activity. Both arguments fail.

---

[90] Tr. 103:10-13; 132:24-133:3.

[91] Tr. 105:15-22; Govt. Ex. 29.

[92] Tr. 105:17-18.

[93] Tr. 105:16-19; 106:15-18.

[94] Tr. 45:14-25; 116:19-117:19; Def. Ex. Q.

[95] Tr. 117:17-22.

[96] Motion to Suppress at 2.

[97] Minute Entry, docket no. 48, filed Dec. 3, 2014 ("Government proposed to proceed with evidentiary hearing on the motion to suppress on issues related to the stop, issues 1-3. . . . Defense agreed.").

**A. Federal, not state law, determines the constitutionality of the vehicle stop**

Vafeades claims that the stop was unconstitutional because CVI Olschlager exceeded the scope of his authority when he initiated the stop. Minnesota law provides CVIs with the authority to issue citations, but not to arrest or to detain, and states that CVIs do not have peace officer powers.[98] *United States v. Le* held it is "well established in this circuit that 'in federal prosecutions the test of reasonableness in relation to the Fourth Amendment protected rights must be determined by Federal law even though the police actions are those of state police officers.'"[99] "[T]he fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended."[100]

In *Le,* the Tenth Circuit considered the defendant's argument that the evidence found pursuant to search warrants should be suppressed because the search warrants did not comply with Oklahoma law.[101] The Court disagreed and found that while state law may be considered as part of a totality of the circumstances in determining whether the warrants were sufficient, federal courts must apply federal law.[102] "The basis for this principle is that 'the exclusionary rule is only concerned with deterring [federal] Constitutional violations.'"[103]

The Tenth Circuit has also considered whether a constitutional violation occurs when an officer acts outside of his authority under state law.[104] During a controlled substance investigation, Missouri officers followed Jones to his residence in Kansas and had a

---

[98] Minn. Stat. § 299D.06.

[99] 173 F.3d 1258, 1264 (10th Cir. 1999) (quoting *United States v. Miller,* 452 F.2d 731, 733 (10th Cir. 1971)).

[100] *United States v. Green,* 178 F.3d 1099, 1105 (10th Cir. 1999) (internal quotation and citation omitted).

[101] *Le*, 173 F.3d at 1264.

[102] *Id.* at 1265.

[103] *Id.* (quoting *United States v. Wright,* 16 F.3d 1429, 1437 (6th Cir. 1994)); *See also United States v. Bach,* 310 F.3d 1063, 1066 (8th Cir.2002) ("[F]ederal courts in a federal prosecution do not suppress evidence that is seized by state officers in violation of state law, so long as the search complied with the Fourth Amendment.").

[104] *United States v. Jones*, 701 F.3d 1300 (10th Cir. 2012).

confrontation with Jones that eventually led to Kansas officers finding evidence of marijuana manufacturing at Jones's Kansas residence.[105] Kansas law prohibits Missouri officers from performing any law enforcement duties, except a fresh pursuit, in Kansas.[106] The Tenth Circuit rejected Jones's argument that the officers violated his Fourth Amendment rights because they were acting outside their lawful jurisdiction.[107] The Court held that examination of state law was not required because the legal standard is whether there was a federal constitutional violation.[108]

In *Virginia v. Moore,* the Supreme Court considered the similar issue of "whether a police officer violates the Fourth Amendment by making an arrest based on probable cause but prohibited by state law."[109] The Court determined that while the Fourth Amendment protects against unreasonable searches and seizures, there is no basis to conclude that it was intended to incorporate state statutes.[110] "While 'individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution,' state law did not alter the content of the Fourth Amendment."[111] The Court held that officers may arrest a person when they have probable cause to believe the person has committed a crime in their presence regardless of state rules prohibiting the arrest.[112] "[T]he arrest rules that the officers violated were those of state law alone, and as we have just concluded, it is not the province of the Fourth Amendment to enforce state law. That

---

[105] *Id.* at 1305.

[106] *Id.* at 1308.

[107] *Id.* at 1312.

[108] *Id.* at 1309.

[109] 553 U.S. 164, 166 (2008).

[110] *Id.* at 169.

[111] *Id.* at 172 (quoting *California v. Greenwood,* 486 U.S. 35, 43 (1988)).

[112] *Id.* at 178.

Amendment does not require the exclusion of evidence obtained from a constitutionally permissible arrest."[113]

In this case, CVI Olschlager's actions were constitutional. Regardless of his state authority to stop Vafeades's truck, Olschlager had a reasonable suspicion that Vafeades was committing a crime of violating a protection order. The Fourth Amendment only requires reasonable suspicion to justify a vehicle stop.[114]

### B. The stop was supported by reasonable suspicion

Vafeades also asserts that CVI Olschlager's stop of the truck was unconstitutional because it was not supported by reasonable suspicion of criminal activity. A vehicle stop is justified when an officer has a reasonable suspicion of criminal activity.[115] After completing the inspection and sending Vafeades back on the road, CVI Olschlager reread the CJIS response and noticed that Vafeades was prohibited from having contact with a person by the same name as the female traveling with him in his truck.[116] CVI Olschlager flagged down Vafeades's truck for the purpose of detaining Vafeades while CVI Harms summonsed Trooper Keenan and Lt. Backes to the weigh station to investigate the possible violation.[117] At the time, CVI Olschlager had reasonable suspicion to believe that Vafeades's contact with Victim A violated Minnesota law, by violating the protection order.

A vehicle stop is similar to an investigative detention, and therefore the same principles apply as in a *Terry* stop to determine reasonableness.[118] The officer must have a reasonable

---

[113] *Id.*

[114] *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

[115] *Id.*

[116] Tr. 27:6-25; 58:15-20; Govt. Ex. 11.

[117] Tr. 28:6-10; 29:20-25; 42:20-22; 60:5-10.

[118] *United States v. McGehee*, 672 F.3d 860, 866 (10th Cir. 2012).

suspicion that the person stopped is engaged in criminal activity or is about to engage in criminal activity.[119] The same standard is true for a traffic stop based on any type of criminal activity, not just a traffic violation.[120]

In *Whitley*, the defendant claimed that the stop of his truck was unconstitutional because it was not based on a traffic violation or based on probable cause.[121] The Tenth Circuit disagreed and found that a traffic stop requires only reasonable suspicion of any crime.[122] "Such a stop is justified 'if the officer bears a reasonable suspicion that criminal activity may be afoot.'"[123] The Court further explained that reasonable suspicion requires more than a hunch but less proof than what is required for probable cause and that reasonable suspicion should be determined by looking at the totality of the circumstances.[124] The stop of Whitley's truck was valid because the officer making the stop had reasonable suspicion (a) that Whitley was a felon based on another officer's research and (b) that Whitley was in possession of a firearm based on a tip to the other officer that Whitley was loading a dead antelope into his truck.[125]

"Reasonable suspicion is defined as 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'"[126] All factors should be considered together,

---

[119] *United States v. Whitley*, 680 F.3d 1227 (10th Cir. 2012).

[120] *Id.*

[121] *Id.* at 1231.

[122] *Id.* at 1233.

[123] *Id.* (quoting *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1205-06 (10th Cir. 2007)).

[124] *Id.* at 1234.

[125] *Id.* 1234-35.

[126] *United States v. Guerrero*, 472 F.3d 784, 787 (10th Cir. 2007) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

rather than individually.[127] Factors that alone may have an innocent explanation can still support a finding of reasonable suspicion.[128]

During the inspection, both CVI Olschlager and CVI Harms noticed Vafeades's unusual behavior, including talking a lot and not allowing Victim A to speak.[129] They also noticed that Victim A was fidgeting, not looking up, and not making eye contact.[130] CVI Harms attempted to make contact with Victim A because she was concerned by Victim A's behavior, specifically that Victim A would not look up when CVI Harms said hello to her.[131] Although there could be an innocent explanation for Victim A's concerning behavior, it may still be considered as a factor in determining whether CVI Olschlager had reasonable suspicion to believe Vafeades was violating a protection order by having contact with Victim A.[132]

Even without considering the unusual behavior of Vafeades or Victim A, CVI Olschlager had reasonable suspicion that Vafeades was engaged in criminal activity. When CVI Olschlager initially ran Vafeades's identification to check for "wants and warrants" he saw that Vafeades was the subject of a protection order but did not notice who Vafeades was prohibited from contacting.[133] Immediately after Vafeades left the weigh station at the completion of the commercial vehicle inspection, CVI Harms and CVI Olschlager discussed their concern and reread the CJIS response. At this point they read the names of the people from whom Vafeades

---

[127] *Id.*

[128] *Id.*

[129] Tr. 25:7-9; 54:4-8.

[130] Tr. 24:24-25:2; 55:5-6.

[131] Tr. 55:16-25.

[132] *Guerrero*, 472 F.3d at 787.

[133] Tr. 27:9-11.

was prohibited from having any communication and realized that one of the names was the same as the name Vafeades called the female traveling with him.[134]

Under Minnesota law it a misdemeanor for a person to violate an order for protection "granted by a judge or referee or pursuant to a similar law of another state . . . ."[135] The CJIS response showed that Vafeades was subject to a protection order issued in Florida.[136] The order required Vafeades to stay away from the protected persons and also prohibited him from making communication with the protected persons.[137] The protected persons include the petitioner and two "minor children."[138] Both CVIs had heard Vafeades call Victim A the same name as one of the listed minor children.[139] CVI Harms knew Victim A could not be with Vafeades because of the protection order.[140] CVI Olschlager knew that possible protection order violations need to be investigated "right away."[141]

CVI Olschlager had reasonable suspicion to believe Vafeades was engaged in criminal activity when he stopped the truck. The Fourth Amendment requires only reasonable suspicion for a vehicle stop.[142] CVI Olschlager believed Vafeades was violating a protection order by being with Victim A. Accordingly, when CVI Olschlager stopped the truck for further investigation the stop was justified by reasonable suspicion and therefore constitutional.

---

[134] Tr. 27:6-25; Govt. Ex. 11.

[135] Minn. Stat. § 518B.01 Subd. 14(b).

[136] Govt. Ex. 11.

[137] *Id.*

[138] *Id.*

[139] Tr. 27:21-23; 58:14.

[140] Tr. 59:4-5.

[141] Tr. 28:5.

[142] *Arvizu,* 534 U.S. at 273.

### C. The CJIS warning does not vitiate reasonable suspicion

Vafeades argues that CVI Olschlager should not have stopped his truck based on protection order in the CJIS response because it says "Do not search, detain, or arrest solely on this record."[143] The language on the CJIS response does not change the constitutionality of the stop. The same analysis that defeats Vafeades's argument that the stop was unconstitutional because it was not authorized by state law (as discussed earlier) also applies to the limiting language of the CJIS printout. A vehicle stop is justified if it is based on a reasonable suspicion of criminal activity.[144]

Although the CJIS Report stated officers should refrain from arresting Vafeades simply because the protection order existed, the report did not prohibit an officer from arresting him if he was violating the protection order.[145] Based on the language of the protection order, CVI Olschlager believed Vafeades was violating the protection order by having contact with Victim A, which is a violation of Minnesota law.[146] CVI Olschlager's reasonable suspicion that Vafeades was violating the protection order was based on the totality of the circumstances: observation of odd behavior and interaction by Vafeades and Victim A;[147] the protection order appeared valid;[148] knowledge that Victim A's first name matched the name of the protection order;[149] and Victim A appeared to be a minor.[150] CVI Olschlager did not stop Vafeades solely because there was an outstanding order for protection. CVI Olschlager stopped Vafeades based

---

[143] Govt. Ex. 11.

[144] *Arvizu,* 534 U.S. at 273.

[145] *See* CJIS Response, Govt. Ex. 11.

[146] Minn. Stat. § 518B.01 Subd. 14(b).

[147] Tr. 24:24-25:2; 25:7-9; 54:4-8; 55:5-6.

[148] Tr. 27:5-28:5.

[149] Tr. 27:6-25; 58:14; Govt. Ex. 11.

[150] Tr. 28:1-4.

on reasonable suspicion under the totality of circumstances that Vafeades was violating the protection order.

Vafeades also argues that the CJIS report language requires contact with the originating agency before any search or detention based on the protection order. However, this argument depends on an erroneous reading of the report. It states: "DO NOT SEARCH, DETAIN, OR ARREST BASED SOLELY ON THIS RECORD. CONTACT ENTERING AGENCY TO CONFIRM STATUS AND TERMS OF PROTECTION ORDER."[151] Vafeades's counsel argued that this means that the "entering agency" must be contacted before any investigation or detention could take place. But the report does not make that statement. It only warns that detention is not authorized by the existence of the order (without facts showing it is being violated) and that the terms of the order should be verified (which was done here). The report does not require investigation or detention be delayed until confirmation with the originating agency.

## II. Detention

Vafeades also claims that the stop was unreasonably extended while State Troopers arrives and while the Troopers investigated the protection order. Both arguments fail.

### A. The stop was lawfully extended until State Troopers arrived to investigate

"In analyzing the constitutionality of a traffic stop under the Fourth Amendment, [courts] apply the 'reasonable suspicion' standard for investigative detentions originally set forth in *Terry v. Ohio*."[152] The "first [question is] whether the officer's action was justified at its inception, then second whether it was reasonably related in scope to the circumstances which justified the

---

[151] Govt. Ex. 11.

[152] *United States v. Winder*, 557 F.3d 1129, 1133 (10th Cir. 2009). Detention and search beyond the routine inspection "requires 'reasonable suspicion' justified by a particularized and objective basis for suspecting criminal activity.  *See United States v. Carreon*, 872 F.2d 1436, 1440 (10th Cir. 1989).

interference in the first place."[153] A "traffic stop may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must  acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity."[154] "To satisfy the reasonable suspicion standard, an officer need not 'rule out the possibility of innocent conduct,' or even have evidence suggesting 'a fair probability' of criminal activity."[155] Significantly, reasonable suspicion "requires 'considerably less' than a preponderance of the evidence and 'obviously less' than that required for probable cause to effect an arrest."[156]  "While probable cause means 'a fair probability that contraband or evidence of a crime will be found,' reasonable suspicion is merely a particularized and objective basis for suspecting criminal activity."[157]

　　In this case, CVI Olschlager had more than reasonable suspicion of criminal activity. The same facts that justified the stop of Vafeades's truck also justify CVI Olschlager detaining Vafeades for ten minutes while waiting for the Minnesota State Troopers to arrive. During the ten minutes they waited for troopers to arrive, nothing happened to dissipate the CVIs' reasonable suspicion. In fact, the CVIs gathered more evidence.

　　After Vafeades returned to the weigh station office, while waiting for the Minnesota State Trooopers to arrive, CVI Harms asked Victim A for her identification to determine whether she was in fact that person listed in the protective order.[158] Victim A did not have her identification.

---

[153] *United States v. Cash*, 733 F.3d 1264, 1273 (10th Cir. 2013) (internal quotation marks omitted).

[154] *United States v. Kitchell*, 653 F.3d 1206, 1217-18 (10th Cir. 2011) (internal quotation marks omitted).

[155] *United States v. Esquivel-Rios*, 725 F.3d 1231, 1236 (10th Cir. 2013) (quoting *Poolaw v. Marcantel*, 565 F.3d 721, 736 (10th Cir. 2009)).

[156] *Esquivel-Rios*, 725 F.3d at 1236 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

[157] *United States v. Tucker*, 305 F.3d 1193, 1200 (10th  2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

[158] Tr. 61:18-21.

Vafeades took Victim A's driver's license out of his wallet and gave it to CVI Harms.[159] The identification showed Victim A's age which surprised CVI Harms because she thought Victim A looked much younger.[160] The identification also confirmed that Victim A was the person listed in the protective order.

Vafeades argues that once the troopers verified that Victim A was no longer a minor, any further detention to investigate the protection order was unreasonable. Vafeades contends that "It is obvious that someone who is no longer a minor child would not be subjected to the restraints and limits imposed upon a minor child.  As such, the police officers in this case lacked a reasonable basis to believe Mr. Vafeades was committing a crime."[161] But the order only refers to the status of Victim A on the date of the order. Nothing in the order states that it only extends through her minority. In fact, the report stated the order has no expiration. The plain reading of the order provides reasonable suspicion of its violation.

Under the totality of these circumstances, CVIs Olschlager and Harms had reasonable suspicion to justify detaining Vafeades for ten minutes until the state troopers arrived to investigate protective order violation.

### B. The Troopers had reasonable suspicion to detain to further investigate

Trooper Keenan and Lt. Backes arrived about five to seven minutes after being called by CVI Harms.[162] The troopers spent the next forty-five minutes confirming the validity of the protective order and clarifying its language. Specifically, Trooper Keenan called dispatch to

---

[159] Tr. 62:1-2.

[160] Tr. 62:12-18.

[161] Defendant's Proposed Memorandum Decision and Order at 21.

[162] Tr. 93:15-16.

confirm the validity of the protective order with the issuing agency.[163] While the troopers were waiting for a response, Vafeades told the troopers that the protective order was not valid and that it only applied when Victim A was a minor.[164] Vafeades offered to retrieve documents from his truck to support his claim. Vafeades also told the troopers that Victim A had been sexually abused and described, in graphic detail, the sexual conduct.[165] The troopers noticed that Victim A appeared uncomfortable and that when they attempted to question her, only Vafeades responded.[166] After a time, dispatch confirmed the protective order was still valid.[167] Trooper Keenan called the Clay County Sheriff's Office and an Assistant County Attorney to make sure they understood the language in the protective order.

The fact that the troopers chose to prolong the stop and proceed cautiously is not unreasonable under the Fourth Amendment. "[I]t is beyond dispute that the Fourth Amendment does not so micromanage the on-the-spot decisions of experienced law enforcement officers."[168] An officer does not act unreasonably when he chooses to take a less intrusive approach and proceed more cautiously.[169] Trooper Keenan was proceeding cautiously by confirming the protective order, verifying the identity of the listed person, and calling the Assistant District Attorney to verify that the protection order was still valid. And the Assistant District Attorney did confirm that the protection order was a lifetime order and still valid.[170] Although the

---

[163] Tr. 96:22-97:9; Govt. Ex. 11 (CJIS warning states, "CONTACT ENTERING AGENCY TO CONFIRM STATUS AND TERMS OF PROTECTION ORDER").

[164] Tr. 97:21-23.

[165] Tr. 99:2-24.

[166] Tr. 99:16-19.

[167] Tr. 101:17.

[168] *United States v. Tubens*, 765 F.3d 1251 (10th Cir. 2014).

[169] *See Tubens*, 765 F.3d at 1255 ("Needless to say, an officer likewise does not act unreasonably when he foregoes *more* intrusive, albeit justified, actions and chooses instead to proceed more cautiously.")

[170] Tr. 103:1-9.

protection order was issued when Victim A was a minor, it did not become invalid once Victim A was no longer a minor.

While Trooper Keenan's actions prolonged the detention, they were necessary to investigate the crime of violating the protection order. The detention was supported by Trooper Keenan's reasonable suspicion that Vafeades was committing a crime.

### III. The arrest was supported by probable cause

A law enforcement officer may arrest a person upon probable cause that the person has or is committing a criminal offense.[171] Trooper Keenan had probable cause to believe Vafeades was violating a protection order, a misdemeanor under Minnesota law.

"When officers have probable cause to believe that a person has committed a crime in their presence, the Fourth Amendment permits them to make an arrest . . . ."[172] "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"[173] "Probable cause is measured against an objective standard."[174]

Minnesota law prohibits people from violating protection orders issued in Minnesota or elsewhere.[175] "[W]henever an order for protection is granted by a judge or referee or pursuant to a similar law of another state . . . and the respondent or person to be restrained knows of the existence of the order, violation of the order for protection is a misdemeanor."[176]

---

[171] *Moore,* 553 U.S. at 176.

[172] *Id*. at 178.

[173] *United States v. Valenzuela,* 365 F.3d 892, 896 (10th Cir. 2004) (quoting *United States v. Edwards,* 632 F.3d 633 (10th Cir. 2001)).

[174] *Id.*

[175] Minn. Stat. § 518B.01 Subd. 14(b).

[176] *Id.*

Trooper Keenan responded to a call from CVI Harms to drive to the Red River Weigh Station to investigate a possible protection order violation.[177] When he arrived at the station, Trooper Keenan reviewed the CJIS response and Victim A's identification to verify that Victim A was one of the individuals named on the protection order.[178] Trooper Keenan asked his dispatcher to contact Sarasota County, Florida to determine whether the protection order was in effect.[179] Minnesota State Patrol received a response from Sarasota County and confirmed that the order was still in effect.[180] Trooper Keenan discussed the protection order with Vafeades and confirmed that Vafeades was aware of the protection order.[181]  Trooper Keenan also called a Clay County Sheriff's sergeant to ask about the language in the order and received the response that "it was probably good."[182] He then called the Assistant County Attorney to ask her advice regarding whether the protection order was still in effect now that the minor child was an adult.[183] The Assistant County Attorney confirmed that based on the language of the order it is a lifetime order and should still be valid.[184] The Assistant County Attorney also advised Trooper Keenan that he should arrest Vafeades.[185]

A reasonable officer would have believed that probable cause existed to arrest Vafeades for violating a protection order when Trooper Keenan confirmed the identities of the parties and

---

[177] Tr. 91:19-22.

[178] Tr. 96:1-7.

[179] Tr. 96:22-23; Govt. Ex. 11 (CJIS warning states, "CONTACT ENTERING AGENCY TO CONFIRM STATUS AND TERMS OF PROTECTION ORDER").

[180] Tr. 100:16-24;

[181] Tr. 98:3-8.

[182] Tr. 102:1-13.

[183] Tr. 102:16-24.

[184] Tr. 103:1-6.

[185] Tr. 103:9.

that the order was valid.[186] When determining whether probable cause exists, the court considers "whether at that moment the facts and circumstances within [the officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [officer] in believing that the petitioner had committed or was committing an offense."[187] Certainly, a prudent officer would have believed that Vafeades was violating a valid order prohibiting him from having contact with Victim A.

But Trooper Keenan did not stop his investigation at that point. Before arresting Vafeades. Trooper Keenan made further inquiries and sought legal advice to confirm that he should arrest Vafeades for the protection order violation.[188] After Trooper Keenan made the decision to arrest Vafeades based on all of the information he had received, Trooper Keenan allowed Vafeades to finish gathering items from the truck.[189] When they returned to office, Trooper Keenan placed Vafeades under arrest for a violating a protection order in violation of Minnesota Statute § 518B.01 Subd. 14.[190] Trooper Keenan had probable cause to arrest Vafeades as required by the Fourth Amendment.

## ORDER

Because reasonable suspicion supported the stop and detention to investigate the protection order violation, and Trooper Keenan had probable cause to arrest Vafeades for violating a protection order;

---

[186] *See Valenzuela,* 365 F.3d at 896-97 ("Thus, the primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." (internal quotes omitted)).

[187] *United States v. Snow*, 82 F.3d 935, 942 (10th Cir.1996) (internal quotations omitted).

[188] Tr. 103:21-24.

[189] Tr. 105:3-6.

[190] Minnesota law requires a law enforcement officer to arrest a person "whom the peace officer has probable cause to believe has violated an order granted pursuant to this section or a similar law of another state . . . if the existence of the order can be verified by the officer."  Minn. Stat. § 518B.01 Subd. 14(e).

IT IS HEREBY ORDERED that the Motion to Suppress[191] is DENIED ON THOSE
ISSUES.

IT IS FURTHER ORDERED that if Vafeades wants to proceed on the remaining issues
raised, but deferred, in the motion to suppress, he may file a brief motion to renew those issues
referring to the prior motion.


Dated March 23, 2015

BY THE COURT:

_____
David Nuffer
United States District Judge

---

[191] Docket no. 41.